[No. 30034. Department Two. November 12, 1946.]

EUGENE R. MARTIN et al., Respondents, v. FRANK B. MOMANY et al., Appellants.[1]

[1]Reported in 174 P. (2d) 305.

W. C. *Hinman* and *Thomas D. Kelley*, for appellants.

*Gordon McGauvran* (*Everett O. Butts*, of counsel), for respondents.

SIMPSON, J.—This action was instituted for the purpose of reforming a written contract of lease. In the original cause, filed October 29, 1945, the plaintiffs were Eugene R. Martin and Grace E. Martin, his wife.

Defendants filed a demurrer on the ground that there was a misjoinder of parties defendant, and that the complaint did not state facts sufficient to constitute a cause of action. The record does not disclose whether the court passed upon the demurrer.

On the same date, an amended complaint was filed in which B. J. [G.] Schultz and Rose M. Schultz were made additional plaintiffs. The amended complaint, upon which the case was tried, alleged that the Martins purchased from Mr. and Mrs. Schultz certain real estate which was described by metes and bounds; that the real estate contract provided:

"It is definitely understood that there is a lease in full force and effect, executed on the 14th day of August, 1944, by and between B. G. Schultz, as lessor, and George Hudson, as lessee, covering the property mentioned herein. Said lease has a term of 2 years, commencing October 1st, 1944, and terminating on the 30th day of September, 1946, with option to extend said lease for a period of 3 years, under the same terms. This lease is in full force and effect and the lessees, or assignees, under the lease, are now in possession.

"The above described property is being sold, subject to the above mentioned lease."

That at the time the lease was made two buildings were situate upon the property, one a dwelling and the other a restaurant.

Plaintiffs further alleged that December 7, 1944, George Hudson, by bill of sale duly recorded, assigned his interest in the lease to defendants Frank B. Momany and Thea Anderson as copartners; that, prior to the making of the assignment of lease, Hudson notified the purchasers that the lease "covered only the restaurant building and the ground adjacent thereto." The complaint then stated that the defendants were exercising a claimed right of control of the residence and were about to rent it to strangers. Plaintiffs asked that the agreement of lease and its assignment be reformed, so that the dwelling be excepted from the terms of the lease.

The defendants answered by a general denial and then alleged by way of affirmative defense and cross-complaint that December 7, 1944, defendants purchased from Hudson a lease upon the whole of the property owned by plaintiffs; that January 17, 1945, plaintiffs Martin had wrongfully entered upon and had taken possession of the residence to defendants' damage in the sum of forty dollars per month.

At the conclusion of the trial, the court entered its judgment and decree of reformation.

Defendants have appealed. The assignments of error, nine in number, question the court's action in the entry of judgment; the making of B. G. Schultz and wife parties plaintiff; and in overruling defendants' demurrer and their challenge to the sufficiency of the evidence to sustain the decree.

We summarize the evidence as follows:

Mr. Martin bought the property in question from B. G. Schultz and wife. Prior to that sale, however, Schultz had leased the property to Hudson.

Mr. McGauvran, the attorney who drew the lease for Mr. Hudson, testified that he and his client visited the property together with Mr. Schultz. He stated that the boundaries of the property were not marked at all, but that it was agreed between Schultz and Hudson that the lease covered the restaurant and the ground upon which it stood, and "nothing else."

He testified further:

"A. The discussion which they had about that was Mr. Hudson asked him if that house could be rented to one of Mr. Hudson's employees and Mr. Schultz collected the rent. THE COURT: Mr. Hudson's employe[e]? A. Yes, the house was rented to one of Mr. Hudson's employees. That is, she rented it from Mr. Schultz and paid the rent to Mr. Schultz and Mr. Hudson knew it. THE COURT: Was that rent agreement made after the lease was executed? A. Oh, yes."

The record does not disclose any contradiction of the testimony of Mr. McGauvran.

Relative to the information given to the Andersons and Momanys concerning the lease, Mr. McGauvran stated:

"THE COURT: You told the Andersons and the Momanys that this residence was not included in the lease and that when they bought the lease, had it assigned to them, they were not acquiring title to the residence itself? A. Very, very definitely. Now then, a discussion came up as to whether or not, legally, they could force that building into the lease and I explained to them they could very definitely not, that Mr. Schultz had that property rented, that the woman who rented the place was a waitress in George's restaurant. She was paying forty dollars a month for it and Mr. Schultz had collected it all the time she was in there and would continue to collect it."

Mr. Martin in this regard testified that after he purchased the property he collected the rents from the lady who lived in the residence.

Defendant Ray Anderson gave the following evidence:

"Q. About how long has Mr. Martin been working inside the house? A. Well, I don't know just how long. He has been working there quite a bit. We had an argument about that, too, him working at the house. He would come at eight o'clock in the morning and be hammering around there and I asked him not to. Q. How long did that go on, how many days? A. He didn't keep coming early like that but that went on, off and on, for a couple or three weeks. Q. Do you know what he was doing? A. Making changes in the house, remodeling it. Q. Have you the key? A. No. Q. Who has? A. Mr. Martin. Q. How long has he had the key? A. Ever since we have been there. Q. Does he claim the right of the house? A. Yes. Q. You have not used the house? A. No."

On cross-examination, Mr. Anderson testified:

"A. Leo [Morton—second tenant] had it rented at the time, yes. That was when the water was shut off. Mr. Martin was renting Leo this house without any water. Q. Mr. Martin rented it to him? A. Yes. Q. You know that of your own knowledge? A. Leo told me that. I suppose he did. Q. Did you tell Leo he would have to pay you the rent? A. No, but Leo knows I ought to have the rent. Mr. Butts: I move to strike that. Q. Did you tell Leo he should pay you the rent? A. No, I didn't. Q. You never told Sadie [Piedt—first tenant] she should pay you the rent? A. No. Q. Now, if I recall your testimony correctly, you never did discuss with George Hudson whether or not this dwelling house went with the assignment of the lease until the night after the papers were signed for record? A. That is right. Q. And in this conversation, which occurred in the restaurant between you and Mr. Hudson and your wife, he told you you really ought to collect the rent from the house? A. No, he didn't tell me I really ought to collect it. He told me I could collect it. . . . Q. Why didn't you collect the rent from Sadie, or ask her about it? Do you know? A. Oh, I don't know why we didn't. There was just no reason about it. She was working there for us, that is, for the Momanys."

 The general law relative to the reformation of written instruments is evidenced by the following statement in 45 Am. Jur. 584, Reformation of Instruments, § 3:

"It is a universal rule, unless some statutory provision intervenes, that a court of equity has the power to afford the remedy of reformation. . . . Relief is granted not for the purpose of relieving against a hard or oppressive bargain or to give either party a better one, but simply to enforce the agreement as it was made and to prevent an injustice which would ensue if this were not done."

 In the exercise of their jurisdiction to reform written instruments, courts of equity proceed with utmost caution, particularly where, subsequent to the execution of the instrument sought to be reformed, there has arisen new circumstances which might have some bearing upon the question of whether or not there was a mutual mistake. This rule is reflected by the degree of proof required by the courts upon which to base a decree.

It is pointed out in *Puget Mill Co. v. Kerry,* 183 Wash. 542, 49 P. (2d) 57, 100 A. L. R. 1220, that such a decree will never be granted upon a probability, but only where the evidence is clear and convincing.

The rule was succinctly stated in the recent case of *Marks v. Scaler's, Inc.,* 2 Wn. (2d) 277, 97 P. (2d) 1084, where it was said:

"In considering this case, we have in mind the principle of law relative to the reformation of written instruments as laid down by former decisions of this court to the effect that, in order to justify judicial reformation, the party claiming the equity must sustain the burden of producing clear, cogent, and convincing evidence of mutual mistake in the drafting of the instrument, and of what was the true agreement and intention of the makers."

We hold with the trial court that the original lease was intended to include the restaurant only, and that all of the appellants were fully acquainted with the intention. It is clear to us, as it was to the trial court, that respondents met the burden of proof imposed upon them by our rule.

Appellants complain that Schultz should have been made a party defendant. We are unable to find that the court committed any error in that respect. The case tried upon its merits concerned only the parties presently interested in the property. The court had jurisdiction of those parties, and its judgment was conclusive of all the questions relative to whether or not it was ever intended that the lease should include both the restaurant and the dwelling.

Finding no error, we affirm the judgment.

STEINERT, CONNELLY, MALLERY, and SCHWELLENBACH, JJ., concur.